**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF NEW YORK**

In re Application of
YS GM MARFIN II LLC;
YS GM MF VII LLC;
YS GM MF VIII LLC;
YS GM MF IX LLC;
YS GM MF X LLC.


For an Order to Conduct Discovery for

Use in Foreign Proceedings

Case No. 20-mc-00182

**DECLARATION OF CHARLES TILDEN STORRS BUSS IN SUPPORT OF
APPLICATION FOR JUDICIAL ASSISTANCE PURSUANT TO 28 U.S.C. § 1782**

I, the undersigned, Charles Tilden Storrs Buss, under oath and penalty of perjury, pursuant to 28 U.S.C. § 1746, and duly authorized, declare the following:

1.     I am over the age of 18 and provide this Declaration based on my own personal knowledge.

2.     I am fluent in English and make this Declaration without the aid of a translator.

3.     The contents of this Affidavit are true and, save where stated, are within my own knowledge.  Where stated, they are true to the best of my knowledge and belief and are based on information provided to me by Ms. Rebecca Fine, of its Office of the General Counsel of YieldStreet Inc., the parent company of YieldStreet Management, LLC.  I qualified as a Solicitor of the Senior Courts of England and Wales in 1993.  I have been a partner in this international law firm since 2000.  I specialize in commercial, maritime and transportation law. I am co-author of *The Law of Ship Mortgages* (Lloyd's Informa, 2016).

4.     I am a Solicitor of the English Senior Courts and a partner in the firm of Watson Farley & Williams LLP in London, England. I am counsel to YS GM MARFIN II LLC; YS

GM MF VII LLC; YS GM MF VIII LLC; YS GM MF IX LLC; and YS GM MF X LLC (each an "<u>Applicant</u>" and, together, the "<u>Applicants</u>") in the legal proceedings described below.

5.      I submit this Declaration in support of Applicant's application for an Order, pursuant to 28 U.S.C. § 1782, for leave to serve The Clearing House Payments Company L.L.C (the "Clearing House") and thirteen intermediary banks[1] (the "Intermediary Banks") (collectively, the "<u>Discovery Targets</u>") with a discovery subpoena in connection with (i) a civil proceeding commenced by Applicant YS GM MF VIII LLC, which is pending before the Commercial Court of Malaya at Kuala Lumpur, Malaysia; (ii) a civil proceeding commenced by Applicants before the Commercial Court of London, England; and (iii) other contemplated proceedings to be filed by the Applicants before English courts as described below.

## I.      FACTUAL BACKGROUND

6.      Applicants are, and were at all material times, entities incorporated under the laws of the State of Delaware, having their principal office at 300 Park Ave, 15th Floor, New York, NY.  Applicants YS GM MARFIN II LLC; YS GM MF VII LLC and YS GM MF X LLC are wholly-owned subsidiaries of another Delaware corporation named YS ALTNOTES I LLC, which in turn is a wholly-owned subsidiary of YieldStreet Inc. Applicants YS GM MF VIII LLC and YS GM MF IX LLC are wholly-owned subsidiaries of a Delaware corporation named YS ALTNOTES II LLC, which is also a wholly-owned subsidiary of YieldStreet Inc.

7.      Applicants all form part of the YieldStreet group which, through its affiliates, provides an online platform where qualified individuals can participate in investment opportunities usually only available to larger institutional investors.  YieldStreet Management LLC manages and operates investment funds.  These investment funds participate in loans to other businesses. These loans are asset-based, meaning they are secured by collateral including,

---

[1] Specifically: (1) Bank of America, N.A.; (2) Bank of China; (3) The Bank of New York Mellon; (4) BNP Paribas USA; (5) Citibank, N.A.; (6) Commerzbank AG; (7) Deutsche Bank Trust Company Americas; (8) HSBC Bank USA, N.A.; (9) JPMorgan Chase Bank, N.A.; (10) Societe Generale; (11) Standard Chartered Bank; (12) UBS AG; and (13) Wells Fargo Bank, N.A..

inter alia, the maritime sectors. Through the online platform, the parent entity of the investment funds offer notes to qualified individuals. The repayment of these notes is dependent upon repayment of the underlying loans in which the investment funds participate.

8. Applicants are special purpose vehicles established to purchase and to dispose of vessels over which the Applicants were given security in the form of, inter alia, ship mortgages over such vessels.

9. Applicants made five loans totaling approximately US$89.2 million in aggregate to several companies that are owned and controlled by the Lakhani family (as more specifically identified below), namely Gemini Marine Ltd., Gemini Marine (No. 1) Ltd., Gemini Marine (No. 2) Ltd., Gemini Marine (No. 3) Ltd., Gemini Marine (No. 4) Ltd., Gemini Marine (No. 5) Ltd., Gemini Marine (No. 6) Ltd., Gemini Marine (No. 7) Ltd., Gemini Marine (No. 8) Ltd., Gemini Marine (No. 10) Ltd., Gemini Marine (No. 12), Ltd., Gemini Marine (No. 13) Ltd., Gemini Marine (No. 14) Ltd., Aquarius Marine Ltd., and North Star Marine Ltd. (collectively, the "Borrowers").

10. The Borrowers are wholly-owned subsidiaries of North Star Maritime Holdings Limited ("NS Holdings"), an entity incorporated under the laws of St Kitts and Nevis. On its side, NS Holdings is owned in a 50% share interest each by Mr. Muhammad Ali Lakhani and Mr. Muhammad Hasan Lakhani, who are sons of Mr. Muhammad Tahir Lakhani and the ultimate beneficial owners of the Borrowers (collectively, the "Lakhanis"). The Lakhanis are believed to be British and Pakistani dual nationals ordinarily resident in England, Pakistan and/or the United Arab Emirates.

11. The Borrowers, NS Holdings, and the Lakhanis are in the business of ship scrapping and recycling.

12. Such loans made by Applicants to the Borrowers were originated and facilitated by a financial advisory boutique named Four Wood Capital Advisors LLC ("FWCA"), a

'Registered Investment Adviser' and a subsidiary of Four Wood Capital Partners LLC ("Four Wood Capital"), a US based private equity fund manager with offices at 100 Wall Street, 11th Floor, New York, NY. FWCA delegated many of its duties to an affiliate named Global Marine Transport LLC ("GMTC").

## A. The Loans

13. Between March 2019 and September 2019, Applicants made five loans to the Borrowers in the total amount of approximately US$89,200,000 (collectively, the "Loans"). More specifically, Applicants made the following loans:

    a. On June 1, 2018, Applicant YS GM MarFin II LLC made a loan of US$25,000,000 to Gemini Marine Ltd., Gemini Marine (No. 2) Ltd., Gemini Marine (No. 3) Ltd., and Gemini Marine (No. 5) Ltd., as joint and several borrowers, for the purchase of the vessels Sprite, Basel, Boron, Lateef, Ley, Amo, Wave, Texis, Prosper, Ladinda, and Bangsa (later amended to raise the loan amount to US$37,500,000 and to add Aquarius Marine Ltd., Gemini Marine (No. 1) Ltd., Gemini Marine (No. 4) Ltd., and North Star Marine Ltd. as further borrowers) (this Loan was referred to as a "revolving credit facility" or "RCF");

    b. On March 22, 2019, Applicant YS GM MF VIII LLC made a loan of US$16,050,000 to Gemini Marine (No. 6) Ltd. for the purchase of the vessel Wu Xian;

    c. On March 31, 2019, Applicant YS GM MF VII LLC made a loan of US$12,650,000 to Gemini Marine (No. 7) Ltd. and Gemini Marine (No. 8) Ltd., as joint and several borrowers, for the purchase of the vessels Geneva, Ana, and Ron (later amended to add Gemini Marine (No. 10) Ltd. as a further borrower);

d. On May 29, 2019, Applicant YS GM MF IX LLC made a loan of US$8,673,473.25 to Gemini Marine (No. 12) Ltd. and Gemini Marine (No. 13) Ltd., as joint and several borrowers, for the purchase of the vessels Ari and Spirit; and

e. On September 11, 2019, Applicant YS GM MF X LLC made a loan of US$ 14,500,000 to Gemini Marine (No. 14) Ltd. for the purchase of the vessel Atban.

14. Applicants made the Loans to the Borrowers to partially finance the purchase of the vessels referred to in each loan above, which (aside the Wu Xian loan, which was to finance that vessel pending completion of her sale to her demise charterer) would be sold by the Borrowers to third party breakers' yards (the "Recyclers") for recycling (known and referred to also as demolition, deconstruction and scrapping).

15. Under the agreements for the Loans (the "Loan Agreements"), the loaned funds were kept in retention accounts. The Borrowers were able to draw funds from the retention accounts only after the Borrowers had issued a vessel drawing request meeting all of the conditions provided in the applicable Loan Agreement and such request has been approved by the required Applicants. Among such conditions, the vessel drawings were subject to a maximum cap of 75% to 80% of the vessel's sale price listed in the memorandum of agreement for sale with the seller (or the vessel's scrap value, if lower), depending on the delivery method of the vessel.

16. In addition, the Applicants were only obliged to release a vessel drawing if the vessel to be acquired, the memorandum of agreement for sale, and the vessel's insurance coverage were all acceptable to the Applicants and (save as regards 'delivered' vessels, referred to further in paragraph 24 below) that the relevant Borrower owned a vessel at the time of the relevant advance (Clause 4.2.2).

17.     Further, the Loan Agreements provided for the repayment of the Loans with interest in the following manner: each drawing was to be repaid within 180 days from the date on which the funds were advanced or, if earlier, the date of the relevant vessel's delivery to the Recycler; and each Loan was to be repaid by a termination date provided in each Loan Agreement (Clause 7).

18.     Moreover, the Loans bore interest at a margin of 9.5% over LIBOR to be paid quarterly in arrears (Clause 9). In case of default on the payment, a further 2% default interest margin would be added (Clause 9.3).

19.     In addition, the Loan Agreements provide for different guarantees and assurances of the Loans in favor of the Applicants, including first preferred mortgages or priority statutory mortgages over the vessels, assignment of insurances, and guarantees from the Borrowers' holding company and members of the Lakhani family, as discussed in more detail below.

20.     Also, Applicants could accelerate the Loans on the occurrence of a number of events of default (RCF, Clause 22.2), including a failure to pay principal or interest (RCF, Clause 22.1.1) and the insolvency of any "Security Party" (defined to include the corporate and personal guarantors) (RCF, Clause 22.1.6).

21.     Moreover, the Loan Agreements were governed by English law (RCF, Clause 35), and elected the English courts in favour of the Applicants to have exclusive jurisdiction to determine disputes, but giving the Applicants the discretion to refer a dispute to any other courts with jurisdiction to hear the matter (RCF, Clause 36).

**B.  The Security for the Loans**

22.     Each one of the Loans was secured by ship mortgages, corporate guarantees, personal guarantees, assignments of sales proceeds and insurance proceeds and pledges of shares.

23.    Applicants were entitled under the Loan Agreements to register a mortgage in respect of the financed vessels (with the exception of the first loan agreement, which was a revolving credit agreement under which the relevant Applicant also agreed to finance vessels referred to as 'delivered' vessels which the Borrowers contracted to be delivered by their sellers directly to the location of the intended Recycler, such that the funds advanced would comprise only a sale contract deposit of up to 20% of the price, with the balance of up to 80% of the sale contract to be repaid directly upon the Borrowers' on-sale of such vessel to the intended Recycler).

24.    The corporate guarantees and personal guarantees were given by four guarantors: (i) NS Holdings, the Borrower's parent company; (ii) Mr. Muhammad Ali Lakhani and (iii) Mr. Muhammad Hasan Lakhani, the owners of NS Holdings and ultimate beneficial owners of the Borrowers; and (iv) Mr. Muhammad Tahir Lakhani, the father or the two latter individuals and manager of the Lakhani family's business (collectively, the "Guarantors").

25.    The Guarantors are individually and personally liable for any unpaid amount under the Loan Agreements. In addition to giving a corporate guarantee, NS Holdings also pledged its interest in the Borrowers as a guarantee to the Loans (collectively, the "Guarantees").

26.    Similarly to the Loan Agreement, the Guarantees are governed by English law and elected the English courts in favor of the Applicants to have exclusive jurisdiction to determine disputes, but giving the Applicants the discretion to refer a dispute to any other courts with jurisdiction to hear the matter (Clause 15).

27.    Every time that a Loan Agreement was amended, the validity of the corresponding guarantee was confirmed by the Guarantors through written deeds of confirmation.

28.     Applicants entered into the Loan Agreements with the Borrowers relying on the above-mentioned guarantees and on the statement of personal wealth provided by the individual Guarantors. Mr. Tahir Lakhani's statement reflected that he personally owned assets that were valued in the total amount of US$28,454,520.

29.     However, the Applicants' recent investigations following the Borrowers' default on all of the Loans (as discussed in greater detail below), have revealed that Mr. Tahir Lakhani never owned (at least as legal owner) a material part of the assets he included as his property in his personal wealth statement, including a real estate property located in Watford, which is in fact owned by a St Kitts & Nevis incorporated entity and which was mortgaged in 2013 to an Emirati bank named Emirates NBD PJSC.  The net worth statement states this property to be worth £2.5 million (which is just over US$3,100,000 at today's rate of exchange).  HM Land Registry's records also show the property to have been purchased on April 25, 2008 for £1,065,000 (equivalent to US$1,272,717 at current exchange rates). According to the leading on-line property valuation service (Zoopla), the property is currently worth £1.66m-£2.03m.  Whilst this is not a formal valuation, it seems unlikely that the property's true market value is as high as US$3,100,000.  That aside, I am informed that local counsel in Pakistan's enquiries indicate that details of land/property in that country in the net worth statement refer to an address which in reality does not exist.

C.     **The Fraud**

30.     Notwithstanding all of the guarantees, mortgages, and approval requirements in place to protect Applicants' investment through the Loans, the Borrowers were able to commit a fraud on Applicants by selling the mortgaged vessels referenced above to Recyclers without obtaining the Applicants' consent or repaying the Loans (the "Fraud").

31.     In order to execute the Fraud, the Borrowers made successive misrepresentations about the registrations of the vessels and their mortgages; the location, the

deliveries and the status of the vessels; the Borrowers' and the Guarantors' assets and cash flow; the availability of the payments to the Borrowers by the Recyclers; and much more, as discussed in more detail below.

32.     While the Borrowers and Guarantors misrepresented the facts and withheld information from Applicants to obtain as many extensions on the repayment of the Loans as possible, the Borrowers utilized a variety of complex and obscure methods to sell the vessels to Recyclers without regard to (and/or satisfaction of) the Applicants' mortgages on such vessels. One example of the methods employed in furtherance of the Borrowers' scheme in this regard is the reflagging of the vessel "Wu Xian" to the Comoros Islands which (as discussed in greater detail below) was effectuated in a manner that facilitated the Borrowers to transfer the title of the Wu Xian to a third party without regard to Applicants' mortgage.

33.     Some of the methods used to perpetrate the Fraud are still under investigation. Applicants believe, for example, that the Borrowers relied on forged certificates of no encumbrance, and/or the expiration of special registrations that were obtained in Palau for vessels destined to be scrapped/recycled and/or on the concealed registration of vessels on concurrent special registers (such as that of the Comoros Islands), to sell the vessels to Recyclers without notification to the Applicants and without satisfaction of the tens of millions cumulatively owed to the Applicants with respect to those vessels.

34.     Further, Applicants recently discovered that the Borrowers presented Memorandums of Agreement for the purchase of the vessels that were most likely false in order to obtain the advancement from Applicants. In fact, the putative sellers of 'delivered' vessels reflected in six of the Memorandum of Agreements appear to be different to the actual owners the vessels (namely Prosper, Light, Baron, Lateef, Ley, and Ladinda) at the time of the sale (at least insofar as the data indicated on marine intelligence databases is concerned). In addition,

Applicants discovered that at least one of such putative sellers is an entity most likely associated with the Borrowers.

35.     By the time Applicants discovered through their own investigations that the Borrowers had beached and scrapped many vessels that Applicants had a mortgage on, or at least the right under the Loan Agreements to register a mortgage on, Applicants were notified that NS Holdings, the holding company of the Borrowers' corporate conglomerate and property of the Lakhani family, had voluntarily requested its liquidation and dissolution in Nevis.

36.     In view of the Fraud and all the events of default to the Loan Agreements committed by the Borrowers and the Guarantors, Applicants accelerated the Loans on March 05, 2020 and notified the Borrowers and Guarantors, demanding the immediate payment of the balance of the Loans, which is approximately US$80,000,000.

### i.     The Default On the Payment of The Loans

37.     Shortly after Applicants and the Borrowers entered into their last Loan Agreement on September 11, 2019, the Borrowers became late in the payments of interest. Upon the request of the Borrowers, Applicants agreed to multiple extensions on the payment of interest.

38.     Subsequently, Borrowers became late in the repayment of the principal amount of the drawings, starting on September 24, 2019, as the Loan Agreements required repayment by no later than 180 days from the date on which the funds were advanced if the financed vessel had not been delivered to the Recycler beforehand.

39.     When inquiries were made about the outstanding payments, the Borrowers provided different excuses, including that the sellers had not delivered the vessels to the Borrowers, let alone to the Recyclers; that there was a downturn in the scrapping market; that operations and processing of payments were delayed due to a cyclone in India; and that Indian and United Arab Emirates' authorities imposed restrictions on transfers of funds abroad.

40. Notwithstanding Applicants' agreement to grant multiple extensions on the payment of both interest and principal, Borrowers became late on payments due under the already extended due dates.

41. Applicants were regularly in contact with the Borrowers, primarily through GMTC, the Applicants' advisors that had originated and facilitated the Loans, and who were the duly appointed provider of loan administration services to the Applicants for the Loans, but also on occasion directly with representatives of the Borrowers, to negotiate the repayment of the principal and the payment of interest. In mid-January 2020, representatives of the Applicants and GMTC travelled to Dubai to meet with the Borrowers to discuss the repayment of the Loans and to make an agreement. On that meeting and on the e-mails exchanged though the following days, Applicants made clear to the Borrowers that Applicants would only grant one more extension for the repayment of the Loans if the Borrowers repaid an advance regarding at least one vessel and provided financial statements about the Borrowers' financial situation. The Borrowers stated that they would provide the required statements. However, such statements were never provided to Applicants.

42. The Borrowers dragged the negotiations for extensions through weeks by promising to provide the required documents and to make partial payments. In the meantime, Applicants sent notices of default and reservation of rights to the Borrowers on January 22, 2020.

43. On March 5, 2020, after negotiations to extend the Loans were unsuccessful and Applicants learned about the other events of default below, Applicants accelerated the Loans and notified the Borrowers and Guarantors in writing, requesting the immediate payment of the balance of the Loans and default interest provided in the Loan Agreements.

### ii. The Unwarranted Scrapping of the Vessels

44.     Applicants held registered mortgages (in the Republic of Palau in all cases except for the "AMO", where the registration was under St Kitts & Nevis flag) and the right to register mortgages over the multiple vessels partially financed through the Loans as security for the obligations set forth in the Loan Agreements (the "Vessels").

45.     Throughout January 2020, Applicants and GMTC reached out to the Borrowers on multiple occasions to make various inquiries about the Vessels. The requests for information included questions about the place where the Vessels were currently registered; the entities that were listed as the registered owners of the Vessels; the documents showing that the mortgages on the Vessels had been duly registered; the status of delivery of the Vessels by the sellers to the Borrowers and, subsequently, by the Borrowers to the Recyclers; and the geographical position of the Vessels, and more.  The Borrowers, however, often failed to provide the requested information and documents, and, as a result, the Applicants did not know the whereabouts of the Vessels and/or whether they had been sold and/or scrapped or not.

46.     On January 8, 2020, NS Holdings provided its provisional balance sheet and cash flow statement for December 31, 2019 to the Applicants. The foregoing documents reported a current owned inventory of vessels financed by the Applicants for recycling valued at US$78,440,000, a figure just above the Borrowers' liabilities owned to Applicants at the time, which were reported as US$78,100,000. .

47.     On February 10, 2020, in view of the persisting lack of information regarding the geographical location of the Vessels, GMTC's representative requested that the Borrowers make the positions of the Vessels verifiable to GMTC by turning on their global positioning systems.  The Borrowers failed to comply, contending that the Vessels lacked electrical power onboard to activate those systems.

48.     On February 13, 2020, Applicants were able to independently verify (through their own investigations) that several Vessels had been beached in Bangladesh, namely the Geneva, Ana, Ron, Ari, Spirit, Basel, Amo, Wave, Texis, Prosper, Bangsa, and Atban.

49.     On February 17, 2020, a representative of the Applicants and a representative of GMTC arranged a trip to obtain information about the location of the Vessels in person at the NS Holdings' offices. The Borrowers again failed to provide information, and instead informed the Applicants and GMTC that the Borrowers were taking photographs of the Vessels and would soon provide verification of their positions.

50.     On February 24, 2020, while Applicants still had not received appropriate information about the geographical location of the Vessels or their status from the Borrowers, Applicants obtained information through their own investigations that twelve of the eighteen Vessels over which Applicants understood they had a mortgage were reported as having already been scrapped, and one other Vessel was reported as sold to a Recycler in Bangladesh. On the following day, Applicants received photographic evidence that at least three other Vessels that Applicants had financed through the Loans were beached.

51.     Relevantly, Applicants neither were informed about the sale, beaching or scrapping of the Vessels, nor received the full repayment of the advancements as required under the Loan Agreements.

52.     Given the circumstances in which the Vessels have been beached and scrapped, Applicants believe that the beaching and scrapping of many of the Vessels occurred before December 2019. If true, that would mean that the Borrowers made misrepresentations on their provisional balance sheets and cash flows provided on January 08, 2020 by listing the already beached and scrapped Vessels as comprising Borrowers' current assets.

53.     Applicants believe that all but one of the Vessels (the Wu Xian) have already been scrapped irrespective of the mortgage interests in favor of the Applicants. Although it has

not yet been scrapped, the Borrowers already sold the Wu Xian to a third party without the Applicants' knowledge and without regard to the mortgage securing the loan advanced to the relevant Borrower to acquire that vessel.

54.     The Borrowers' scheme to beach, scrap and sell the Vessels without notifying the Applicants and/or repaying the approximately US$80 million owed under the Loans is not only fraudulent, but a breach of the Loan Agreements. Accordingly, on March 5, 2020, Applicants accelerated the Loans and sent written notice to Borrowers and the Guarantors advising them of the acceleration and demanding immediate payment.

### iii.    The Fraud Involving the Loan Agreement of March 22, 2019 for Refinancing the Vessel Wu Xian

55.     The investigations of the details of the Fraud in respect to each Vessel and Loan Agreement are still ongoing.

56.     Notwithstanding the foregoing, the Applicants have already been able to discover some details about the Fraud with respect to the Loan Agreement of March, 22, 2019 for the refinancing of the vessel Wu Xian.  The foregoing Loan Agreement was intended to refinance a very large crude oil carrier vessel (often abbreviated to VLCC) called Amlah, later renamed the Wu Xian, which was already in the Lakhanis' and NS Holdings' control and intended to be resold by the Borrowers in due course.

57.     As part of the refinancing, Wu Xian was transferred, pursuant to a Memorandum of Agreement, from her owner at that time, Cobb Maritime No. 5 Ltd, to the Borrower Gemini Marine (No.6) Ltd., both of which are Marshall Islands entities ultimately owned by NS Holdings and controlled by the Lakhanis. The intention was to later sell the Wu Xian in September 2019 to a Hong Kong incorporated buyer (the "Lessee"), that was at the time operating the Wu Xian, as an offshore floating oil storage unit, under the terms of a bareboat charter with Cobb Maritime No. 5 Ltd..

other things, (i) informing the Applicants and GMTC on September 19, 2019 that the Lessee was still chartering Wu Xian and would make the payments for the lease of the Wu Xian up to the maturity date of the loan, (ii) informing Applicants that the Wu Xian would be delivered to the Lessee by November 16, 2019 and the Loan would be fully repaid then; and (iii) commencing negotiations with Applicants on September 25, 2019 (after the Wu Xian had already been sold and delivered to the COSCO Affiliate) to extend the Loan Agreement and the bareboat charter agreement for 60 days until the COSCO Affiliate was purportedly able to complete the purchase of the Wu Xian.

65.     Investigations by the Applicants have recently revealed that (i) on September 8, 2019, the Borrower executed a bill of sale of Wu Xian in favor of the Lessee; (ii) on September 16, 2019, the Lessee paid US$13,431,200 to Holman Fenwick Willan Singapore LLP, as the escrow agent for the sale of the Wu Xian from the Borrower to the Lessee; (iii) on September 16, 2019, the Lessee took delivery of the vessel; and (iv) on November 26, 2019, the bill of sale in the Lessee's favor was recorded in Panama, thus reflecting the Lessee as Wu Xian's current title holder.  The afore-mentioned sum of US$13,431,200 was not wired to YS GM MF VIII LLC by the escrow agent, whether to the account to which lease rentals had been previously paid or to any other account of the Applicants, and appears to have been misappropriated by the Borrowers.

66.     Borrowers have defaulted on the Loan for the refinancing of the Wu Xian.  The current amount due of approximately US$4,465,00.00 was included in the request for immediate payment by the Borrowers and the Guarantors under the notice of acceleration of the Loans sent by Applicants on March 5, 2020.

### iv. The Liquidation of NS Holdings

67.     On February 25, 2020, Applicants were informed by a British firm of accountants that a Nevis court had ordered the liquidation and dissolution of NS Holdings according to s.120(4) of the Nevis Business Corporation Ordinance of 2017.[2]

68.     The Nevis Court order reflected that NS Holdings' liquidation and dissolution had been voluntarily requested by the NS Holdings' shareholders. In addition, the referenced court order indicated that London liquidators were appointed and that the dissolved company would remain in existence for 3 years after dissolution for the purpose of, among other things, discharging its liabilities.

69.     Under the Loan Agreements, the voluntary liquidation of NS Holdings, as a guarantor of the Loans, and the consequent appointment of liquidators by a Nevis Court to manage that entity's affairs, constitute events of default under the Loan Agreements, and, therefore, provided additional grounds for the acceleration of the Loans reflected in the written notice sent to the Borrowers and the Guarantors on March 5, 2020 requesting immediate payment of the balance of the Loans and penalties of approximately US$80,000,000.

70.     None of the Borrowers or Guarantors have responded substantively to Applicant's notification of acceleration of the Loans or made any payments to the balance of the Loans and penalties.  The only communication that the Applicants have received is a holding email dated  March 6, 2020, from Mishcon de Reya LLP, a firm of English attorneys whom the liquidator informed me were representing the Guarantors, which stated that they were taking instructions on the matter and would revert, but they have not since done so.

---

[2] S.120(4) - At any time within three (3) years after the filing of the Articles of Dissolution, the High Court, in a special proceeding instituted under this section, upon the petition of the corporation, or of a creditor, claimant, director, officer, shareholder, subscriber for shares, or incorporator or any other person in interest, may continue the dissolution of the corporation under the supervision of the High Court and may make all such orders as it may deem proper in all matters in connection with the dissolution or in the winding up of the business and affairs of the corporation, including the appointment or removal of a receiver, who may be a director, officer or shareholder of the corporation.

### D. The Pending and Contemplated Proceedings

71. On March 16, 2020, Applicant YS GM MF VIII LLC filed a civil proceeding with an application for a warrant of arrest to be issued against the Wu Xian before the Commercial Court of Malaya at Kuala Lumpur, Malaysia (the "Malaysian Proceeding"). The Malaysian court ordered the arrest of the Wu Xian on March 16, 2020 and the warrant of arrest was thereafter served on the vessel on March 18, 2020. Applicant is seeking in the Malaysian Proceeding to have the Malaysian court declare the sale of the Wu Xian to have been concluded with notice and subject to Applicant's mortgage interest, in which latter event the sums due under the Wu Xian loan will be recoverable from the Lessee and/or *in rem* from the proceeds of sale of the Wu Xian following its judicial sale.

72. Moreover, under English Law, Applicants hold contractual civil claim rights against the Borrowers and the Guarantors for the total defaulted amount of the Loans and the penalties provided in the Loan Agreements and Guarantees. In addition, Applicants hold equitable proprietary tracing claim rights against all persons (such as employees of the Guarantors' companies) who knowingly assisted in the Guarantors' frauds and/or breaches of trust and/or knowingly received proceeds of the sale of the Vessels that were beached and scrapped without regards to Applicants' mortgage rights.

73. Applicants yesterday (April 02, 2020) obtained, at an *ex parte* hearing before the Commercial Court in London, England a worldwide freezing injunction against each of the Guarantors, the effect of which is to prohibit the Guarantors from removing assets from the jurisdiction up to the value of US$76.7 million or disposing of assets wherever located up to that value (the "UK Proceeding" and, together with the Malaysian Proceeding, the "Pending Proceedings"). Annexed as Exhibit B is a true and accurate copy of the Worldwide Freezing Injunction. My firm gave notice of the Freezing Injunction having been ordered to the Guarantors and to Mishcon de Reya LLP. The Pending Proceedings remain subject to applicable response deadlines and further litigation.

74.     Applicants further expect imminently to commence a proceeding before the civil court in London, England, to collect the debt under the Loan Agreements against the Borrowers and the Guarantors. Also, Applicants may seek ancillary actions before such courts of competent jurisdiction against the transferees of the proceeds of the sale of the Vessels that were beached or scrapped without reference to Applicants' mortgage, including any companies that are connected to the Fraud, to trace and collect such proceeds (collectively, the "Contemplated Civil Proceedings").

75.     Accordingly, Applicants seek information from the Discovery Targets for use in the Pending Proceedings and in the Contemplated Civil Proceedings. Specifically, the evidence sought is necessary to reveal further details about the Fraud, including as it relates to the use and transfer of proceeds relating to the same, which will be grounds for the relief to be sought in all proceedings.

76.     In addition, Applicants seek information relating to the payment of US$13,431,200 (or such other sum as may have been paid after addition of interest and/or deduction of fees) by the escrow agent, Holman Fenwick Willan Singapore LLP, to the Borrower Gemini Marine (No.6) Ltd. or to related entities involved in the fraud over Wu Xian, which is likely to reveal information about how those parties perpetrated the Fraud involving Wu Xian. Such information will be used to support the Applicants' requests to obtain satisfaction of the sums due to GM MF VIII LLC as the mortgagee of the vessel and to have the Malaysian court declare the sale of the Wu Xian to have been concluded with notice and subject to Applicant's mortgage interest or further that the Lessee was complicit in the Frauds and liable as such to the Applicants.

77.     Further, information relating to U.S. Dollar denominated transfers to or from the Borrowers and the Guarantors is likely to reveal assets upon which English civil court may enter asset freezing orders in order to satisfy the debt due to Applicants.

78.     Moreover, information relating to the U.S. Dollar denominated transfer from the Borrowers, the Guarantors, the Lessee and related entities involved in the fraud over Wu Xian, and any other purchaser or facilitator of purchase of any Vessel is likely to reveal information relevant to tracing the proceeds of the sale of the Vessels that were beached or scrapped in order to identify potential defendants to Applicants' equitable proprietary tracing claims before the English civil courts and/or other relevant courts.

79.     Lastly, the evidence sought is likely to reveal the details of the Fraud perpetrated by the Lakhanis and their controlled entities, which Applicants can rely on as evidence to prove the elements of the Fraud in the Pending Proceedings and Contemplated Civil Proceedings.

## II.     APPLICANT SATISFIES THE STATUTORY REQUIREMENTS UNDER 28 U.S.C. § 1728

80.     Applicant seeks assistance from the United States District Court for the Southern District of New York to obtain relevant and probative documentary evidence from the Discovery Targets for use in the Pending Proceedings and Contemplated Proceedings.

81.     The Clearing House regularly transacts business in this District and operates the Clearing House Interbank Payment System ("CHIPS"), which is a funds-transfer system that processes and maintains records of payment messages between banks.  Similarly, the Intermediary Banks are banks that transact business in this District, including as correspondent banks, clearing international U.S. Dollar denominated wire transfers between banks.

82.     Applicants seek CHIPS and intermediary bank payment messages naming or referencing the Borrowers, the Guarantors or Holman, Fenwick & Willan involved in the fraudulent payment of the balance of the purchase price of US$13,431,200 of Wu Xian, and entities and individuals that are known to be affiliated with and/or directly or indirectly owned and controlled by the Lakhanis who perpetuated the more than $80 million Fraud, as listed on

**Exhibit A**, [3] regardless of whether such persons or entities are originating or receiving such payment. Such evidence is extremely important to reveal the details of the Fraud, which will be grounds for the reliefs sought in the Pending Proceedings and the Contemplated Civil Proceedings; to reveal details of the Fraud regarding Wu Xian in support of Applicants' possessory and proprietary claims over Wu Xian; to locate assets belonging to the Borrowers and the Guarantors, which could be levied upon to satisfy the debt due to Applicants; to identify transferees and trace the proceeds of the sale of the Vessels that were beached and scraped which could be levied upon to satisfy Applicants' mortgage securities over defaulted Loans.The Discovery Targets reside or are found in this District, and as such, are proper discovery targets pursuant to 28 U.S.C. § 1782.

83. The Clearing House does not appear to operate in Malaysia or in England and will not likely be subject to the jurisdiction of any Malaysian or English court.

84. Additionally, even though some of the Intermediary Banks do operate business in New York, Malaysia and England, nothing indicates that the Intermediary Banks were participants of the Fraud. Instead, it is believed that the fraudsters may have used the Intermediary Banks to receive, transfer and/or conceal the proceeds of the Fraud. Therefore, the Intermediary Banks are also not expected to become parties to the Pending Proceedings or to the Contemplated Civil Proceedings, but hold invaluable information related to the Fraud.

85. The Discovery Targets are not parties to the Pending Proceedings and are not expected to become parties to the Contemplated Civil Proceedings. Indeed, absent the instant Application, the evidence would almost certainly remain outside the reach of the Malaysian and English courts.

---

[3]        Exhibit A   contains a brief summary of the information provided by Ms. Fine concerning the known connections between the parties involved in the Fraud and the entities controlled by the Lakhanis.

86.     Further, there is no indication the Malaysian or English courts would not be receptive to the documentary and testimonial evidence sought through the instant Application. Such evidence is likely admissible in the Malaysian and English courts, and the Application does not circumvent any proof-gathering restriction under Malaysian or English law.

87.     The discovery sought to be served on the Discovery Targets is not intrusive or unduly burdensome. Applicant seeks documentary evidence concerning payment transactions, which is evidence of the type that the Discovery Targets regularly retrieve and produce as third parties or actual parties in litigation. Furthermore, Applicants are limiting their requests for CHIPS and intermediary bank payment messages naming or referencing the Borrowers, the Guarantors entities and individuals that are known to be affiliated with and/or directly or indirectly owned and controlled by the Lakhanis to the period beginning with June 01, 2018, date that the first Loan Agreement was entered into, to the present and/or to the Discovery Targets' applicable document and/or information retention period. Moreover, Applicants limit their requests for CHIPS and intermediary bank payment messages naming or referencing the escrow agent, Holman Fenwick Willan Singapore LLP, to the period beginning September 2019 through the present, i.e., the months following the escrow agent's receipt of funds relating to the purchase of the Wu Xian.

## Conclusion

In light of the foregoing, Applicant respectfully submits that all of the requirements of 28 U.S.C. § 1782 are met:

a.      The Discovery Targets reside and are found in this District;

b.      Applicants are an "interested person" within the meaning of the statute;

c.      Applicants seek to obtain documents and testimony for use in a foreign proceeding; and

d.      The Discovery Targets have relevant and pivotal information concerning payment transactions involving the Borrower Gemini Marine (No.6) Ltd., and other entities related to Wu Xian in the Pending Proceedings; and the Borrowers, the Guarantors, and the transferees of the proceeds of the sale of the Vessels that were beached or scrapped and entities and individuals that are known to be affiliated with and/or directly or indirectly owned and controlled by the parties who perpetuated the more than $80 million Fraud, as listed on **Exhibit A** in the Contemplated Civil Proceedings.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 3rd day of April 2020, in Canterbury, UK

By:

Charles Tilden Storrs Buss